1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**

8 **EASTERN DISTRICT OF CALIFORNIA**

9

10

11 | MARTIN DAREE MILLER, | Case No. 1:11-cv-01994-LJO-SKO-HC
12 |          Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY THE PETITION FOR WRIT OF HABEAS CORPUS (D0C. 1) AND
13 |      v. | TO ENTER JUDGMENT FOR RESPONDENT
14 |
15 | | FINDINGS AND RECOMMENDATIONS TO DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY
16 | L. S. McEWEN, |
17 |          Respondent. | **OBJECTIONS DEADLINE: THIRTY (30) DAYS**

18

19         Petitioner is a state prisoner proceeding pro se and in forma

20 pauperis with a petition for writ of habeas corpus pursuant to 28

21 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge

22 pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 through 304.

23 Pending before the Court is the petition, which was filed on

24 December 2, 2011.  Respondent filed an answer with supporting

25 documentation on July 25, 2012, and Petitioner filed a traverse on

26 January 18, 2013.

27         I.  Jurisdiction

28         Because the petition was filed after April 24, 1996, the

effective date of the Antiterrorism and Effective Death Penalty Act

1

of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

The challenged judgment was rendered by the Superior Court of the State of California, County of Tulare (TCSC), located within the territorial jurisdiction of this Court.  28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).  Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights.  The Court concludes it has subject matter jurisdiction over the action pursuant to 28 U.S.C. §§ 2254(a) and 2241(c)(3), which authorize a district court to entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000); Wilson v. Corcoran, 562 U.S. -, -, 131 S.Ct. 13, 16 (2010) (per curiam).

An answer was filed on behalf of Respondent Warden L. S. McEwen.  Pursuant to the judgment, Respondent had custody of Petitioner at Petitioner's institution of confinement when the petition was filed.  (Doc. 19.)  Petitioner thus named as a respondent a person who had custody of Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  See, Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994).  Accordingly, the Court concludes that it has jurisdiction over the person of the Respondent.

///

2

II.   <u>Procedural and Factual Summary</u>

Petitioner was convicted in the TCSC on April 25, 2004, of murder, attempted murder, and assault with a firearm in violation of Cal. Pen. Code §§ 187(a), 664 and 187(a), 245(a)(2), and 120222.53(c) and (d).  He is serving a sentence of 82 years years to life.  (Pet., doc. 1, 1.)

Petitioner appealed the judgment and raised claims in various petitions for post-judgment collateral review, which will be detailed as necessary in connection with Petitioner's specific claims.

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); <u>Sanders v. Lamarque</u>, 357 F.3d 943, 947-48 (9th Cir. 2004).  This presumption applies to a statement of facts drawn from a state appellate court's decision.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009).

The facts of the offenses were summarized in the decision of the Court of Appeal of the State of California, Fifth Appellate District (CCA), in <u>People v. Martin Daree Miller</u>, case number F055635, appearing at 2009 WL 5067612, *1-*4 (Dec. 28, 2009), as follows:

FACTUAL SUMMARY

In November 2005, a group of young people attended a party in Tulare. Included in the crowd were five Black males, Miller, Tristan Evans, Debrae Evans, Adell Evans FN2 and Frankie Wilson, all related by blood or marriage. Miller and Wilson were from Arizona and were in Tulare visiting

3

Tristan. Miller, who played football in college, was a big stocky man, standing six feet three inches tall and weighing 270 pounds. Debrae was also large, at six feet two inches tall and weighing approximately 260 pounds. Wilson weighed 170 pounds and was five feet nine inches tall. Adell was smaller, weighing 160 pounds and standing about five feet nine inches tall. The five men heard about the party after meeting some young women at a store.

> FN2. In order to distinguish between the three Evans men, we refer to them by their first names.

At the party, a fight broke out among some of the Hispanic partygoers. Someone, identified only as a "Mexican," fired into the crowd. Several individuals were shot, including Debrae and a young Hispanic female. Dario Davalos was at the party. He and an acquaintance, Sandro Munguia, took the young Hispanic female victim to the hospital in his pickup truck. There were other victims who were also transported to the hospital by friends. Jesse Rios, his brother Miguel Rios, and his girlfriend Elise Flores had been at the party and also came to the hospital. There were several others from the party who were present.

Miller and his relatives drove Debrae to the hospital in Tristan's white car, but they stopped at Tristan's house first, allegedly to tell Tristan's girlfriend that they were taking Debrae to the hospital and to ask her to call Debrae's parents. Tristan, however, spent all his time at the hospital on the phone trying to call Debrae's father. Davalos testified that the Miller group arrived after he did.

In the hospital emergency room, emotions ran high. Adell was extremely agitated and accused the Hispanics present of shooting his brother. Several witnesses claimed that Davalos, Rios, and others tried to calm down Adell, telling him that they had not been the shooters, and that they too had friends in the hospital who had been shot. They were not successful.

The conflict in the emergency waiting room escalated and the group was told by the hospital security guard to leave. The group moved to the parking lot. Witnesses testified that Adell was arguing with Jesse Rios. All witnesses said that the conflict was between a mixed group

4

of Hispanics and a group of Black males. Davalos said he was standing with Rios when a Black male came up with a gun and started to shoot. Rios was shot in the eye and died as a result of his wounds. Davalos turned and ran but was shot as he did so. Davalos identified the Black male shooter as a big man, "kinda thick," taller and considerably heavier than Davalos. Davalos picked Miller out of a photo lineup, saying that he was "50% sure" Miller was the shooter. Davalos testified at trial that Miller looked like the shooter.

Munguia testified that at the hospital a car full of Hispanics and a car full of Black males wanted to fight. He testified that he saw Miller shoot Rios and Davalos. He described Miller as being between 5 feet 10 inches and 6 feet, and as being "kinda stocky." Munguia said that Miller was wearing a gray sweatshirt. He said after the shooting, Miller ran to the white car—the same one that had been used to bring Debrae into the hospital. Munguia said he had seen Miller at the party and identified him at trial as the shooter.

Flores said she was standing next to Rios and that a tall Black man, built like a football player, was the shooter. She said the shooter was wearing a gray Arizona sweatshirt with gray and orange writing. She said that after the shooting the Black men ran to a white car and drove off.

Wilson testified that he was standing next to Adell when he saw a "spark" in his face from behind and realized it was a gunshot. He turned around and saw Miller running. Wilson also ran back to the car, as did Adell. The three left in the white car, leaving Tristan and Debrae at the hospital. Miller was driving. Shortly after, Miller and Wilson switched places because, according to Wilson, he was the only one with a driver's license. Miller, however, did have a driver's license, and it is undisputed that he drove to the party.

The group went back to Tristan's house. Wilson and Adell threw their shirts and hats into a neighbor's trash can. Wilson said that Miller was not with them at this point and he did not know what happened to the gray sweatshirt Miller had been wearing. Wilson thought the sweatshirt had something on the front of it.

Miguel was not a cooperative witness at trial, expressing
fear about testifying. He testified that Rios was trying
to calm people down without success when he was shot.
Miguel said he ran when Rios was shot but saw the shooter
jump into a white car and drive away. He said the shooter
was big and refused to identify anyone at trial. At the
preliminary hearing, Miguel testified emphatically that
Miller was the shooter and was wearing a gray sweatshirt
with orange writing at the belly.

Hospital supervisor Alan Davis testified that he saw a
young Hispanic man and a young Black man in a heated
discussion outside the hospital emergency room. The Black
man was claiming that someone had shot his brother. Davis
then saw a Black man walk off and then veer into the
crowd. Davis heard a pistol cocking and saw the Black man
raise his arm and shoot. Davis said the shooter had on a
two-tone shirt that was lighter on top and darker at the
bottom. Davis said the shooter was approximately 5 feet 11
inches or 6 feet tall, stocky, athletically built, and
around 280 pounds. The shooter ran to a light-colored car.

The police arrived at Tristan's house the morning after
the shooting, shortly after Debrae had been released from
the hospital. Miller, Adell, Tristan, and Wilson were
arrested. When interviewed by police, Miller admitted to
shooting Rios and Davalos. He claimed that he picked up a
gun that had been abandoned at the scene of the party. He
said he got the ammunition for the gun from a friend.
Miller told police that Adell was angry because his
brother had been shot and was arguing with the Hispanics
from the party present at the hospital. When the group
moved to the parking lot, Miller said that Adell was
arguing with two Hispanic males. Miller said he saw the
Hispanic male go to his waistband, and wanted to "back up"
his cousin so he shot him. He said he shot Davalos because
he thought Davalos was armed as well. Miller also told
police that, after leaving the hospital, he disposed of
the gun but did not know where. The murder weapon was
never recovered.

Miller also said he changed his clothes when he got back
to Tristan's house. The police never found a gray
sweatshirt with orange writing. They did find a gray
sweatshirt that Tristan's girlfriend thought Miller had
been wearing at the time. The shirts Wilson and Adell wore
were recovered from the neighbor's trash can. All three

6

items tested positive for gunshot residue. The expert
reported that the amount of gunshot residue on the two
shirts worn by Wilson and Adell indicated exposure to
residue from the discharge of a firearm. Both these shirts
were visibly stained with blood. The small amount of
gunshot residue found on the sweatshirt did not provide
substantial evidence of exposure to a firearm being
discharged. There was no obvious blood on the sweatshirt
and there was an old bullet hole in the shirt.

Several .40-caliber shell casings were found at the scene
of the party shooting. These casings matched the casings
found at the scene of the hospital shooting. Tristan said
that he had .40-caliber ammunition in his house. Police
recovered a .40-caliber bullet and a pistol grip in a
search of Tristan's car. They also found a pistol with
ammunition in the house at the time it was searched.

    Defense

At trial, Miller denied shooting Rios and Davalos. He
claimed he never admitted being the shooter during the
police interview. Miller's interview was not taped because
the tape recorder was inadvertently paused at the start of
the interview. Miller testified he had stayed with the car
when the group dropped off Debrae until he saw Adell in a
conflict with a group of Hispanics. He then left the car
and walked over to the group. He said he had not arrived
at the group yet when he heard shooting and turned to run
back to the car. When Adell and Wilson arrived, the three
drove off. Miller said he saw another car leave as well.
Miller said no one in the group had a gun, and he had not
seen the gun at Tristan's, the ammunition, or the pistol
grip in the car.

The police interviews of Adell and Wilson were taped and
both individuals claimed they had not seen Miller shoot
Rios or Davalos. Adell said Miller was not the shooter;
Wilson said he did not know who was the shooter. The
defense claimed this was a case of mistaken identity and
suggested that the shooter was a rival gang member. Two of
the witnesses picked someone other than Miller as the
shooter in the photographic line up. Denise Garcia picked
someone who looked like the shooter but said she was not
certain; the individual she selected was not Miller. The
hospital security guard also picked someone other than
Miller as the shooter. The guard did say that Miller was

7

in the group outside the emergency room. The guard also testified that the shooter was a Black medium-sized man and described "medium size" as someone weighing about 200 pounds. He then, using a hospital surveillance photograph, identified a Black male, later identified as Wilson, wearing a distinctive black and white shirt, as the person he believed was the shooter. The guard reiterated a number of times that he could not be sure who the shooter was and said he believed that Wilson was the shooter because he had made threatening comments earlier in the emergency room. When interviewed by police, the guard said the shooter was a tall Black male in dark clothing. Davis picked out Tristan as the shooter when asked to identify the shooter in the photo line up.

In support of the defense gang theory, several witnesses said that gang members were present at the party. Flores testified that the fight at the party started when Rios and another man began to fight with others and that she remembered seeing "blue," the color of the Surreño gang. She said that Rios's friends claimed "red," the color of the Norteños. She also said that Rios used to hang out with the Norteños, but now hung out mostly with Crips. Flores also said that Rios tried to tell Adell that it was the "enemy" who shot Debrae. Defense counsel represented that there was one witness, Jose Yanez, who could not be located to testify at trial but who said he saw a person wearing a blue rag over his face shoot Rios.

People v. Martin Daree Miller, 2009 WL 5067612, at *1-*4.

III.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an

8

unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as
opposed to the dicta, of the decisions of the Supreme Court as of
the time of the relevant state court decision. Cullen v.
Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.
Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S. 362,
412 (2000).

A state court's decision contravenes clearly established
Supreme Court precedent if it reaches a legal conclusion opposite
to, or substantially different from, the Supreme Court's or
concludes differently on a materially indistinguishable set of
facts. Williams v. Taylor, 529 U.S. at 405-06. A state court
unreasonably applies clearly established federal law if it either 1)
correctly identifies the governing rule but then applies it to a new
set of facts in an objectively unreasonable manner, or 2) extends or
fails to extend a clearly established legal principle to a new
context in an objectively unreasonable manner. Hernandez v. Small,
282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.
An application of clearly established federal law is unreasonable
only if it is objectively unreasonable; an incorrect or inaccurate
application is not necessarily unreasonable. Williams, 529 U.S. at
410. A state court's determination that a claim lacks merit
precludes federal habeas relief as long as fairminded jurists could

disagree on the correctness of the state court's decision. Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011). Even a strong case for relief does not render the state court's conclusions unreasonable. Id. To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 786-87.

The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. Cullen v. Pinholster, 131 S.Ct. at 1398. Habeas relief is not appropriate unless each ground supporting the state court decision is examined and found to be unreasonable under the AEDPA. Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. at 1398. Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1). Id. at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state

10

court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  A state court decision on the merits based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Pursuant to § 2254(d)(2), a habeas petition may be granted only if the state court's conclusion was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  For relief to be granted, a federal habeas court must find that the trial court's factual determination was such that a reasonable fact finder could not have made the finding; that reasonable minds might disagree with the determination or have a basis to question the finding is not sufficient.  Rice v. Collins, 546 U.S. 333, 340-42 (2006).  To conclude that a state court finding is unsupported by substantial evidence, a federal habeas court must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.  Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004).  To determine that a state court's fact finding process is defective in some material way or non-existent, a federal habeas court must be satisfied that any appellate court to whom the

11

defect is pointed out would be unreasonable in holding that the state court's fact finding process was adequate.  Id.

With respect to each claim raised by a petitioner, the last reasoned decision must be identified to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1).  Barker v. Fleming, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); Bailey v. Rae, 339 F.3d 1107, 1112-13 (9th Cir. 2003).

IV.   Exclusion of Evidence Resulting from an Unlawful
       Arrest and Entry

To the extent Petitioner contends his statements should be suppressed as the fruit of a warrantless entry and arrest in violation of the Fourth and Fourteenth Amendments, Petitioner argues that he exited a residence only because he was threatened with physical harm, and thus he exited while under arrest.  (Trav., doc. 30, 5.)  He contends there was no exigency, and the officers had time to obtain a warrant.  He further contends there was no consent to the entry or search, but rather only an acquiescence to an assertion of authority.  (Id. at 7-8.)

Respondent contends Petitioner received a full and fair opportunity to litigate his claim and thus is not entitled to relief in this proceeding.  Where the state has provided the petitioner with an opportunity for full and fair litigation of a Fourth Amendment claim, the petitioner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial.  Stone v. Powell, 428 U.S. 465, 494 (1976).  The limitation of Stone v. Powell applies to claims regarding Fourth Amendment objections to the admissibility of statements that result from an unlawful

seizure.  <u>Cardwell v. Taylor</u>, 461 U.S. 571, 572-73 (1983); <u>Reed v. Farley</u>, 512 U.S. 339, 347 (1994).

In <u>Stone</u>, the Court did not set forth a test for determining whether a state has provided an opportunity for full and fair litigation of a claim.  However, in a footnote the Court cited <u>Townsend v. Sain</u>, 372 U.S. 293 (1963), which held that a federal court must grant a habeas petitioner an evidentiary hearing if 1) the merits of the factual dispute were not resolved in the state hearing; 2) the state factual determination is not fairly supported by the record as a whole; 3) the state court's fact-finding procedure was not adequate to afford a full and fair hearing; 4) there is a substantial allegation of newly discovered evidence; 5) the material facts were not adequately developed at the state-court hearing; or 6) for any reason the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  <u>Stone v. Powell</u>, 428 U.S. at 494 n.36 (citing <u>Townsend v. Sain</u>, 372 U.S. at 313). Other factors include the extent to which the claims were briefed before, and considered by, the state trial and appellate courts. <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176 1178-79 (9th Cir. 1990).

Even though a petitioner may contend the state court's factual findings concerning a search are not supported by the evidence, a petitioner has been provided a full and fair opportunity to litigate his search claim where the validity of the search was raised in a pre-trial motion, the trial court held a hearing at which the petitioner was permitted to present evidence and examine witnesses, the trial court made a factual finding, and there was judicial review of the trial court's decision. <u>Moormann v. Schriro</u>, 426 F.3d 1044, 1053 (9th Cir. 2005).

Here, Petitioner fully briefed and presented his claim with the assistance of counsel at trial where his claim was the subject of a hearing at which witnesses testified. (3 RT 33-98.) The trial court determined the claim on the merits, finding that the warrantless arrest was lawful due to exigent circumstances and consent. (2 CT 462-66.) Petitioner appealed the judgment through counsel. Although he did not raise the issue in the direct appeal, he had the opportunity to do so. (LD 1-LD 3.)[1] Petitioner raised the issues in petitions for collateral relief before the trial court, CCA, and CSC. (LD 7-LD 12.) The circumstances of Petitioner's opportunity to litigate his search claims are analogous to those of the petitioner in Moormann v. Schriro, 426 F.3d 1044.

After reviewing the pertinent record of the state court proceedings, the Court concludes that Petitioner was afforded a full and fair opportunity to litigate his claims concerning the Fourth Amendment. Therefore, he cannot receive habeas corpus relief in this proceeding pursuant to 28 U.S.C. § 2254.[2]

V.   Contentions concerning Petitioner's Statements

Petitioner alleges his right to due process under the Sixth and Fourteenth Amendments was violated when after he was arrested at a third party's home, he was questioned without being informed of his

---

[1] "LD" refers to documents lodged by Resondent.

[2] In the traverse, Petitioner alleges that the entry and arrest also violated his rights under the California constitution. (Trav., doc. 30, 4.) It is improper to raise substantively new issues or claims in a traverse, and a court may decline to consider such matters; in order to raise new issues, a petitioner must obtain leave to file an amended petition or additional statement of grounds. Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994), cert. den., 514 U.S. 1026 (1995). Here, amendment would be futile because Petitioner's claim is based on California law and thus does not warrant relief in this proceeding. See Wilson v. Corcoran, 131 S.Ct. at 16; Estelle v. McGuire, 502 U.S. at 67-68; Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002).

Miranda rights; he was taken to a station where he was questioned after requesting counsel; and he was then coerced into making prejudicial statements.  (Pet., doc. 1, 4.)  Petitioner argues his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the trial court admitted testimony regarding statements of Petitioner, who suffered post-traumatic stress disorder (PTSD), because the statements were coerced by unspecified psychological and physical means.  (Id. at 5.)

Respondent contends that the trial court properly found that Petitioner did not make a clear request for counsel and waived his right to counsel before making admissions.  (Ans., doc. 19, 20-24.)

    A.   Background

The last reasoned decision on this issue was the decision of the trial court.  When Petitioner raised the issue in a habeas petition to the TCSC, the court noted the issues regarding the admissibility of his statements were fully litigated at the preliminary hearing and the pretrial and trial stages of the proceedings, and the trial court's rulings and viewpoint had been correct and without error.  (LD 7, LD 8 at 3.)

At a hearing on his pretrial motion, Petitioner testified he was taken to the police station, placed in a cold cell, and ignored when he asked deputies who walked past his cell for food and a blanket.  (3 RT 123-26.)  Officer Haney confirmed Petitioner had been in the jail more than six hours and it was after the noon hour; however, he believed Petitioner had been fed.  (Id. at 101, 105, 118-19.)  Petitioner was a twenty-one-year-old student who played football at San Diego State.  (Id. at 137.)

///

15

When taken into an interview room with two detectives who were putting a new tape in a tape recorder, Petitioner testified that he was told there were cameras at the hospital, and they had him on video.  Petitioner told the officer, "Oh hell no, I want a lawyer." (3 RT 126.)  The detectives asked if he had his own lawyer, and he said he did not, and asked, "Aren't you guys supposed to get me one?"  (Id. at 127.)  A detective said they did not know anything about getting a lawyer and that lawyers just complicate things. (Id.)  One detective said, "You don't want to give a statement." Petitioner testified that he responded, "I want to give a statement, but I only want to give a statement when my—-when I have an attorney present."  (Id. at 128.)  Petitioner was read his Miranda rights, but when he stated he wanted a lawyer, he was taken back to his cell.  (Id. at 129, 131.)

Petitioner denied he told them that he wanted to talk with them without a lawyer present and understood that he would procure a lawyer in the future.  Petitioner also denied telling the detectives he shot someone because he thought they were reaching for a gun.  (3 RT 129-32.)

At the hearing, Officer Darren Altermatt testified he and Officer Haney met with Petitioner in a booking interview room; when Haney left the room, Petitioner made a comment about having a public defender; when Haney returned, Altermatt told him that Petitioner had asked for an attorney, and the interview essentially stopped before it got started.  (3 RT 141-43.)  Altermatt believed that part of the Miranda warnings had been given before Petitioner asked about an attorney; however, Petitioner kept stating he wanted to talk to them but was not sure about an attorney; he was that he would have

16

to wait for a couple of days for a court-appointed attorney, and then Petitioner continued to insist on wanting to talk to them.  He eventually said, "I'll talk without an attorney."  (Id. at 143-45.) Petitioner then made a statement indicating that he was responsible for the death of Jesse Rios.  (Id. at 145.)

Officer Haney's testimony at the hearing was essentially consistent with that of Officer Altermatt.  Petitioner had been arrested around 5:45 a.m. and was approached by Haney before 3:00 p.m. after Petitioner had been housed in a single cell at the police department.  (3 RT 100-02.)  When the detectives began to walk Petitioner back to his cell, Petitioner was told they were done, but Petitioner said no, he wanted to give a statement but wanted to know if the attorney could sit with him.  Haney informed Petitioner he did not know how to arrange that, but if Petitioner did not have his own attorney, he would be assigned one at arraignment and could call for an appointment to give a statement with his attorney.  (Id. at 108, 110-11.)  When Petitioner was informed of his Miranda rights, including his right to have an attorney present before any questions and to have such an attorney appointed free of charge, Haney said, "[s]o I need a voluntary either you're gonna talk to us or you don't want to talk to us and you're going to wait for a lawyer."  Haney testified Petitioner stated he wanted to speak with them, and would go ahead and speak with them.  (Id. at 116-117.)  In the context of communicating to Petitioner that he did not have to give a statement, Haney told Petitioner he would be arraigned in two days and after being assigned an attorney, Petitioner could give a statement at that time.  Petitioner responded, "[N]o, no, I want to give a statement.  I don't want to wait."  (Id. at 117-21.)  Haney

testified he tried to end it several times and even told Petitioner just to wait for his attorney, but Petitioner kept wanting to give a statement.  (<u>Id.</u> at 118.)

Haney testified the officers were unaware until after the statement was completed that the tape recorder did not record the interview.  After about half an hour, they asked Petitioner to undergo a second interview that would be recorded; however, Petitioner started yelling "that he didn't do that shit," and he said he wanted to get a lawyer, which resulted in his being returned to his cell.  (3 RT 120-22.)

The trial court's decision was as follows:

> Well, the law is clear that the burden is with the People by a preponderance of the evidence. That's the low standard in our system of justice. There are credibility issues here because there's a difference in testimony about what factually occurred between what the defendant has testified and what the officers have testified.
>
> The law is also clear that if a demand is made for counsel before questioning, that ends the conversation. And I think Mr. Alavezos, you're correct in characterizing what occurred not as a demand for counsel, but an inquiry with respect to counsel.  The officer's statement that "I wouldn't know how to go about doing that," referred to obtain a lawyer for you now so a lawyer can be here while we question you.
>
> The defendant clearly had the option to be represented by counsel which would be a delay or you can waive that right and subject yourself to an interview.
>
> If he asserts his right to counsel, the further communication with regards to a statement has to be made by the defendant. But we didn't really get to that point even though I think clearly the further request was made by the defendant here.
>
> But the Court finds by a preponderance of the evidence that there was not a definitive request for counsel. There was an appropriate <u>Miranda</u> warning and that he waived his

18

<u>Miranda</u> rights and gave a statement. So the defendant's motion is denied.

(3 RT 162-163.)

## B.   <u>Analysis</u>

To implement the Fifth Amendment privilege against self-incrimination made binding upon the states by the Fourteenth Amendment, the Supreme Court has held that statements made in the course of custodial interrogation are not admissible in the prosecution's case-in-chief in a criminal case unless the defendant is advised that 1) he has the right to remain silent, 2) anything he says can be used against him in court, 3) he has a right to counsel before questioning and to counsel's presence during interrogation, 4) if he is indigent, counsel will be appointed for him before interrogation, and 5) the government demonstrates that the defendant voluntarily and intelligently waived his privilege against self-incrimination and his right to counsel.   <u>Miranda v. Arizona</u>, 384 U.S. 436, 468-75 (1966); <u>Harris v. New York</u>, 401 U.S. 222, 226 (1971).

The prosecution bears the burden of demonstrating by a preponderance of the evidence that the defendant validly waived his <u>Miranda</u> rights.   <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986).   A waiver must be 1) voluntary, or the product of a free and deliberate choice and not the result of intimidation, coercion, or deception, and 2) knowing, or "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

19

abandon it.'"  Berghuis v. Thompkins, 560 U.S. 370, 382-83 (2010)

(quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  A waiver of

Miranda rights may be express and formal, or implied through all the

circumstances, including the words and conduct of the person

interrogated.  Berghuis v. Thompkins, 560 U.S. at 383 (citing North

Carolina v. Butler, 441 U.S. 369, 373 (1979)).  Specifically, a

waiver may be implied through "the defendant's silence, coupled with

an understanding of his rights and a course of conduct indicating

waiver."  Berghuis, 560 U.S. at 384 (quoting North Carolina v.

Butler, 441 U.S. at 373).  "Where the prosecution shows that a

Miranda warning was given and that it was understood by the accused,

an accused's uncoerced statement establishes an implied waiver of

the right to remain silent."  Id.

    An invocation of the right to counsel must be unequivocal and

unambiguous; however, once the right is clearly invoked, there can

be no further questioning until either a lawyer is made available or

the suspect himself re-initiates the conversation.  Smith v.

Illinois, 469 U.S. 91, 92-96, 98 (1984).  The test is whether the

statement is sufficiently clear that a reasonable police officer in

the circumstances would understand the statement to be a request for

counsel.  Davis v. United States, 512 U.S. 452, 459 (1994).  The law

requires an objective inquiry into whether there has been a

statement that can reasonably be construed as a request for the

assistance of counsel that is also unambiguous and unequivocal.  Id.

at 458-59.

///

Petitioner's testimony and his reaction when the officers suggested a second interview demonstrate that Petitioner invoked his right to counsel and did not waive it.  However, it was the province of the trial court to evaluate the credibility of the witnesses' conflicting testimony on the issue of advice as to Miranda rights and waiver of those rights.  The officers' testimony supported a conclusion that initially, Petitioner made a statement about counsel, and the officers adjourned the interview.  However, before transport back to his cell, Petitioner indicated a desire to give a statement with counsel and questioned the officers regarding the way appointment of counsel would occur.  Petitioner was informed of his right to counsel, that appointment of counsel would occur at arraignment, and that arraignment would occur in a couple of days.  The discussion concerning the process of appointment of counsel prompted Petitioner to express a desire to make a statement, which resulted in the officer's effort to clarify whether Petitioner wanted to speak with the officers or did not wish to speak and wanted to wait for a lawyer.  These circumstances support a conclusion that Petitioner did not invoke his right to counsel; however, he re-initiated conversation with the officers about giving a statement and about the appointment of counsel.  Further, once he was fully informed of his rights and received some information on the process of appointment of counsel, Petitioner voluntarily chose to waive the presence of counsel and made the statement.

Under the circumstances, the trial court's decision was consistent with the standards of Smith and Davis.

C.  Coercion

Respondent does not address Petitioner's claim that his

admission or confession should be excluded as involuntary.  A valid

waiver of Miranda rights generally results in a finding of

voluntariness of a confession following the waiver.  DeWeaver v.

Runnels, 556 F.3d 995, 1003 (9th Cir. 2009), cert. denied, 130 S.Ct.

183 (2009) (quoting Missouri v. Seibert, 542 U.S. 600, 608-09 (2004)

and Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).  In

determining whether a statement or confession was involuntary and

obtained in violation of due process protected by the Fifth and

Fourteenth Amendments, a court examines whether a defendant's will

was overborne by the circumstances surrounding the giving of the

statement or confession.  Dickerson v. United States, 530 U.S. 428,

434 (2000).  A court considers the totality of all the surrounding

circumstances, including the characteristics of the accused and the

details of the interrogation.  Id.

    Here, if Petitioner's claim that his admission was involuntary

was preserved for this Court's review, the Court concludes

Petitioner has not shown he is entitled to relief in this

proceeding.  The interrogation was brief, Petitioner was advised of

his rights and acknowledged he understood them, the government did

not engage in coercive or improper conduct, and Petitioner was a

mature individual who, after being informed of his rights, chose to

speak without counsel despite having been informed he could remain

silent and/or have a free attorney before or during questioning.

Even if the issue is viewed de novo, Petitioner's statement was

voluntary in light of the absence of coercive police activity.

Further, a finding that Petitioner's statement was "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment is consistent with the standards set forth above; it is not contrary to, or an unreasonable application of, clearly established federal law.  See, Colorado v. Connelly, 479 U.S. 157, 167 (1986).  Accordingly, it will be recommended that Petitioner's Miranda claim and his claim that his confession was involuntary be denied.

Petitioner mounts no argument and cites no authority to support his generalized assertion of an Eighth Amendment violation in connection with the admission of his statements.  Accordingly, it will be recommended that any Eighth Amendment claim concerning the statements be denied.

VI.  Sufficiency of the Evidence

Petitioner alleges he suffered a violation of his due process rights based on the insufficiency of the evidence to support his convictions and enhancements.  He challenges the sufficiency of the evidence as follows: 1) there was no physical evidence that Petitioner possessed, used, or fired a firearm; 2) a test of Petitioner for gunshot residue (GSR) was negative;  3) there was no unequivocal identification of Petitioner by witnesses, and other identifications were tainted by newspaper photographs of Petitioner; 4) no murder weapon was recovered; and 5) the evidence included testimony as to an alleged confession, a recording of which had been accidentally paused or erased.  (Pet., doc. 1, 4.)

Respondent contends the TCSC rejected the claim on state habeas corpus and found no basis for Petitioner's failure to have raised his issues on appeal (LD 7, LD 8), and that decision was left undisturbed by the other state courts who considered the claim on habeas corpus. (Ans., doc. 19, 24-25.) However, Respondent proceeds to address the claim on the merits. (Id.)

A. Legal Standards

To determine whether a conviction violates the constitutional guarantee of due process of law because of insufficient evidence, a federal court ruling on a petition for writ of habeas corpus must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 20-21 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th Cir. 1998); Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

All evidence must be considered in the light most favorable to the prosecution. Jackson, 443 U.S. at 319; Jones, 114 F.3d at 1008. It is the trier of fact's responsibility to resolve conflicting testimony, weigh evidence, and draw reasonable inferences from the facts; it must be assumed that the trier resolved all conflicts in a manner that supports the verdict. Jackson v. Virginia, 443 U.S. at 319; Jones, 114 F.3d at 1008. The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but rather whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Circumstantial

evidence and inferences reasonably drawn therefrom can be sufficient to prove any fact and to sustain a conviction, although mere suspicion or speculation does not rise to the level of sufficient evidence.  United States v. Lennick, 18 F.3d 814, 820 (9th Cir. 1994); United States v. Stauffer, 922 F.2d 508, 514 (9th Cir. 1990); see Jones v. Wood, 207 F.3d at 563.  The court must base its determination of the sufficiency of the evidence from a review of the record.  Jackson at 324.

The Jackson standard must be applied with reference to the substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Windham, 163 F.3d at 1101. However, the minimum amount of evidence that the Due Process Clause requires to prove an offense is purely a matter of federal law. Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2064 (2012) (per curiam).

Under the AEDPA, federal courts must also apply the standards of Jackson with an additional layer of deference.  Coleman v. Johnson, - U.S. -, 132 S.Ct. 2060, 2062 (2012); Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court thus asks whether the state court decision being reviewed reflected an objectively unreasonable application of the Jackson standard to the facts of the case.  Coleman v. Johnson, 132 S.Ct. at 2062; Juan H. v. Allen, 408 F.3d at 1275.  The state court's determination on a question of sufficiency of the evidence is entitled to considerable deference under 28 U.S.C. § 2254(d).  Coleman v. Johnson, 132 S.Ct. at 2065.

25

B.  <u>Analysis</u>

Here, even if the claim is reviewed <u>de</u> <u>novo</u>, the evidence is sufficient for a rational trier of fact to find the challenged essential elements of the crime beyond a reasonable doubt, including that Petitioner personally used a firearm and shot both Jesse Rios and Dario Davalos.

Sandro Munguia testified regarding the development of the conflict, the argument, and having observed Petitioner shoot Jesse Rios and Davalos from a distance of a few feet with a gun that Petitioner had by his side and had cocked behind his back.  (4 RT 315-33.)  Miguel Rios testified he was about fourteen to sixteen feet from his brother Jesse, who was trying to calm everyone down, when Jesse was shot; Miguel did not know who the shooter was, but he agreed that he testified at the preliminary hearing it was Petitioner.  (5 RT 470-478, 493, 522.)  Miguel agreed he had testified at the preliminary hearing that Petitioner walked up with a gun and said, "'Back off my cousin.'" (<u>Id.</u> at 493.)  Petitioner walked towards them, cocked his gun, pushed Jesse, and told him to leave or he would be shot.  (<u>Id.</u> at 493.)  When Jesse stepped towards Petitioner, Petitioner put the gun to Jesse's head and shot him.  (<u>Id.</u>)  Dario Davalos testified that when he tried to calm down Jesse Rios and a Black male with whom Jesse was arguing, another male approached with a gun and began shooting.  (4 RT 249, 259-61.)  Finally, Tulare Police Officer Todd Davis testified that Davalos had identified Petitioner in a photographic line-up.  (6 RT 712-15.)  Davis and Haney testified that when interviewed, Petitioner said that in response to a movement to his waistband made by one of the Hispanic males in the parking lot, Petitioner took out his gun to

26

protect Adell and shot one of them, who fell to the ground.
Petitioner then shot in the direction of the second Hispanic male
because he thought the latter might also have had a gun.  Petitioner
admitted firing the gun four or five times.  (Id. at 715-722, 790-
91.)

In summary, multiple sources of evidence with solid value
permitted a rational trier of fact to conclude that Petitioner used
a firearm to shoot at Rios and Davalos and thereby committed the
offenses against Rios and Davalos.  It must be assumed that the
trier of fact resolved all conflicting inferences in favor of the
judgment.  The fact that some contradictory evidence was before the
trier does not upset the judgment where the evidence is sufficient
for a rational trier to conclude that Petitioner used a gun to shoot
at the two victims.  Accordingly, it will be recommended that
Petitioner's claim or claims regarding the sufficiency of the
evidence be denied.

VII.  Exclusion of a Gang Expert's Testimony

Petitioner alleges the trial court violated his rights under
the Sixth, Eighth, and Fourteenth Amendments, abused its discretion,
and denied Petitioner's right to present a defense when it excluded
unspecified testimony of unspecified defense gang experts.  (Pet.,
doc. 1, 5.)  Petitioner alleges the trial court failed to permit a
police gang expert to testify on a possible retaliatory motive that
would have supported Petitioner's defense of mistaken
identification.  (Trav., doc. 30, 2.)

To the extent Petitioner's claim addresses an abuse of
discretion under state evidentiary law, Petitioner is not entitled
to relief because the claim presents only a state law issue.  28

U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 131 S.Ct. at 16; <u>Estelle v. McGuire</u>, 502 U.S. at 67-68; <u>Souch v. Schaivo</u>, 289 F.3d at 623.

A.   <u>Background</u>

The last reasoned decision was the decision of the CCA, which the CSC left undisturbed when it summarily denied review.   (LD 6.)

The CCA's decision on Petitioner's claim is as follows:

I. Exclusion of gang evidence

Miller claims the trial court abused its discretion and denied him a defense when it precluded him from introducing evidence that gang culture requires that gangs retaliate after being targeted by rival gang activity. The trial court excluded the gang expert testimony, ruling that, although there was some evidence that gang members were present at the earlier party, there was no evidence that the shootings at the party or later at the hospital were gang motivated. After explaining that it understood the defense claim that the shootings at the party, if gang motivated, would have provided someone with the motive to retaliate, the trial court noted:

"Here, we don't have that. We have, really, a claim by the defense that [the shooting] was gang related and someone out there in one gang or another, we don't even know which gang, had the motivation [to commit the offense] because this expert's going to testify retaliation is important to the gang member, and we have nothing else to indicate that. [¶] The Court's not going to allow it. The gang is not probative in this case. If it has any probative value at all, which I highly question, the time consumption and the ability to really divert the jury and mislead them is great...."

On appeal, we review a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718.)

The defense is entitled to present evidence of third-party culpability in order to exonerate a defendant if the evidence is capable of raising a reasonable doubt about the defendant's own guilt. (*People v. Sandoval* (1992) 4

28

Cal.4th 155, 176.) The evidence Miller sought to present
falls within this category because it was intended to show
that someone other than Miller had a motive for shooting
the victims. The rule governing third-party culpability
evidence does not, however, " 'require that any evidence,
however remote, must be admitted to show a third party's
possible culpability.... [E]vidence of mere motive or
opportunity to commit the crime in another person, without
more, will not suffice to raise a reasonable doubt about a
defendant's guilt: there must be direct or circumstantial
evidence linking the third person to the actual
perpetration of the crime.' [Citation.]" (*Id.* at p. 176.)

We conclude that Miller's showing related to third-party
culpability is insufficient. There was evidence that there
were gang members present at the party where the initial
shootings occurred. There was also evidence that Rios had
some gang affiliation. There was no evidence, however,
other than pure speculation, that the party shooting was
gang motivated or that the hospital shooting was a
retaliatory act. The defense merely raised the possibility
that others had a motive to shoot the victims at the
hospital but provided no direct or circumstantial evidence
linking gang activity to the shootings. Although defense
counsel represented that there was a witness named Yanez
who had reported seeing someone with a blue rag in the
parking lot commit the offense, Yanez was not produced at
trial. No one at trial suggested that anyone other than a
large Black male, present at the hospital and standing in
or near the crowd, was the shooter. No other witness
mentioned a blue rag.

This case is similar to *People v. Edelbacher* (1989) 47
Cal.3d 983, 1017-1018, where the defense sought to
introduce evidence concerning the victim's association
with motorcycle gangs and drug dealers in order to prove
that someone other than the defendant committed the
murder. In *Edelbacher*, our Supreme Court held that such
evidence was inadmissible where no possible suspect other
than the defendant was identified, where there was no link
of any third person to the crime, and where only a
potential motive was alleged. (*Ibid.*) This is the
situation we have before us. All the evidence establishes
that the conflict at the hospital was between the group
with Rios and the group with Miller. There is no evidence
that Miller or his relatives were gang members or that the

dispute between the two groups was gang related. No evidence links the offenses to a rival gang member.

Given this record, we conclude that the gang expert testimony proffered here was too speculative and tangential to be admissible under the third-party culpability evidence rule. (See *People v. Lewis* (2001) 26 Cal.4th 334, 373 [trial court properly excluded third-party culpability evidence as "too speculative to be relevant"].) The probative value of the evidence, if any, did not outweigh its prejudicial effect and the trial court did not abuse its discretion in excluding it. (*Ibid.*; see also *People v. Babbitt* (1988) 45 Cal.3d 660, 682 [evidence irrelevant if it produces only speculative inferences].)

Even if we were to conclude it was error to exclude the evidence, there is no prejudice. The jury heard the gang evidence, which the defense claimed supported the inference that the shooting at the hospital was done in retaliation for the shooting at the party. The jury heard that there were members of rival gangs present and that the victim had changed gang allegiances. It heard that, when the initial fight at the party erupted, one witness remembered there being both Surreños and Norteños present. We may take judicial notice that citizens of Tulare County and other valley communities know that relationships between rival gangs often erupt in violence as gang members seek to protect their turf and retaliate against one another to even the score. (Evid.Code, § 451, subd. (f); see *Medina v. Hillshore Partners* (1995) 40 Cal.App.4th 477, 481 [court takes judicial notice as matter of common knowledge that street gangs protect home territory and gang activity spawns violence].) Had the jury wanted to draw the inference the defense claims it should have been allowed to develop, it could have done so without the help of an expert.

We are also not convinced that the jury's questions during deliberation regarding (1) Miller's admission to police and (2) its request for a read-back of several witnesses' testimony suggest the jury was having trouble reaching a verdict. We agree with respondent that the request for read-backs and the questions asked by the jury reflect a consciousness of the jury's responsibility and its diligence in carrying it out. (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.)

Further, although there was some evidence that would have
supported a reasonable conclusion that someone other than
Miller was the shooter, there is no evidence to support a
reasonable conclusion that the shooter was someone other
than one of Miller's group. All of the witnesses to the
event who testified at trial, without exception, said the
shooter was in or near the crowd of people in the parking
lot surrounding Rios and Adell. All of them identified the
shooter as a Black man. All of them said the shooting
stemmed from a confrontation between Rios and a Black man.
Although there was some disparity among the eyewitnesses'
descriptions of the shooter, none of them identified the
shooter as a gang member and all of them said the shooter
was in close proximity to the argument.

In addition to the eyewitness testimony, there was
additional independent evidence that Miller was the
shooter, including evidence that Miller confessed to
shooting Rios when interviewed by the two detectives;
Miller's behavior after the shooting; the behavior of his
relatives after the shooting; and the ammunition and
pistol grip found in the car. Given the overwhelming
evidence of guilt, we conclude that, excluding the gang
expert testimony, even if error, would have caused Miller
no harm.

For these same reasons, we also reject Miller's contention
that the exclusion of the evidence violated his state and
federal constitutional rights to present a defense. The
absence of the expert testimony was not prejudicial under
any standard of review.

People v. Martin Daree Miller, 2009 WL 5067612, at *4-*6.

### B.   Legal Standards

Although state and federal authorities have broad latitude to
establish rules excluding evidence from criminal trials, the Due
Process Clause of the Fourteenth Amendment and the Compulsory
Process and Confrontation clauses of the Sixth Amendment guarantee a
criminal defendant a meaningful opportunity to present a complete
defense.   Crane v. Kentucky, 476 U.S. 683, 690 (1986).   A defendant

has a right to present a defense by compelling the attendance and presenting the testimony of witnesses.  Washington v. Texas, 388 U.S. 14, 18-19, 23 (1967).  However, a defendant does not have an absolute right to present evidence without reference to its significance or source; the right to present a complete defense is implicated when the evidence the defendant seeks to admit is relevant, material, and vital to the defense.  Id. at 16.  Further, the exclusion of the evidence must be arbitrary or disproportionate to the purposes the exclusionary rule is designed to serve.  Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006).  If the mechanical application of a rule that is respected, frequently applied, and otherwise constitutional would defeat the ends of justice, the rule must yield to those ends.  Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

      C.  Analysis

    The CCA properly determined there was no violation of the right to present a defense because exclusion of the evidence was not prejudicial.  People v. Miller, 2009 WL 5067612 at *4-*6.  There was an absence of evidence that the party shooting was gang- motivated, the hospital shooting was a retaliatory act, Petitioner or his relatives were gang members, the dispute between the two groups was gang-related, there was a link between the offenses and any rival gang member or any specific third person, or that there was a specific suspect possible other than the defendant.  There was no concrete gang motivation scenario.  The state court correctly noted that the evidence established that the conflict at the hospital was between the group with Rios and the group with Petitioner.  Under the circumstances, the proffered evidence had very slight probative

value and was not material to the issues.  A fairminded jurist could therefore conclude that no weighty interest of Petitioner was infringed.

Further, excluding the evidence advanced goals related to the administration of justice.  A fairminded jurist could conclude that the exclusion of the evidence avoided repetition and eliminated only marginally relevant evidence to avoid confusion of the issues and misleading the jury.  As the state court observed, the jury had already received evidence that warranted commonsense inferences without the aid of the expert.  It was reasonable for the state court to conclude that the exclusion of the testimony was not arbitrary or disproportionate.

Even if there was error in excluding the evidence, an error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 631 (1993).  The jury heard evidence concerning the presence of rival gangs, Nortenos and Surenos, at the party and the victim's having changed gang allegiances; the trier was already aware of generalized gang evidence.  Because the proffered evidence lacked probative value and in view of the strong evidence of Petitioner's guilt, a fairminded jurist could conclude there was no prejudice.

There is also merit to Respondent's contention that there is no clearly established federal law governing the state court's admission of expert testimony.  Respondent relies on Moses v. Payne, 555 F.3d 742 (9th Cir. 2009), which upheld the exclusion of the defendant's expert witness's testimony regarding the victim's depression.  The state court rule in Moses v. Payne admitted expert

33

testimony if it would assist the trier of fact to understand the evidence or a fact in issue, such as when the testimony concerned matters beyond the common knowledge of the average layperson and was not misleading.  Id. at 756.

The court in Moses considered whether clearly established federal law governed the state court's decision excluding the evidence as cumulative and not sufficiently probative to outweigh likely prejudice and confusion.  The court noted that the Supreme Court's decisions did not either squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence, or clearly establish a controlling legal standard for evaluating discretionary decisions to exclude the type of evidence at issue.  Id. at 758-79.  The court concluded the state court's decision upholding the trial court's discretionary exclusion of the expert testimony could not have been, and thus was not, contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Id. at 759.

Based on Moses v. Payne, the state court's decision upholding the trial court's discretionary exclusion of expert testimony concerning generalized retaliation in gangs was not contrary to, or an unreasonable application of, clearly established federal law. It will be recommended that Petitioner's claim concerning the exclusion of the gang expert's testimony be denied.

VIII.   Instructional Deficiency

Petitioner alleges his rights under the Sixth, Eighth, and Fourteenth Amendments were violated by the trial court's failure properly to instruct the jury with CALCRIM no. 361.  (Pet., doc. 1,

34

5.)  Petitioner challenges the trial court's actual reading of the instruction, which omitted major portions.  Petitioner equates the omission with a failure to instruct the jury on an element of the offense.  (Trav., doc. 30, 12-13.)

    A.  <u>Background</u>

The last reasoned decision on this issue was the decision of the CCA, which was left undisturbed by the CCA's denial of review. (LD 6.)  The CCA's decision is as follows:

> Next Miller contends that the trial court erred when it failed to include in its instructions to the jury Judicial Council of California Criminal Jury Instructions (CALCRIM) No. 361. The instruction directs the jury how to evaluate a defendant's testimony when a defendant fails to explain or deny evidence against him. Miller claims the instruction was "key to the jury's assessment of appellant's credibility" and the omission was prejudicial. We disagree.

> It is undisputed that CALCRIM No. 361 was included in the instruction packet and the trial court intended to give it. The record reveals, however, that although the trial court started reading CALCRIM No. 361 (it read the phrase "[I]f the defendant failed in his testimony"), it inadvertently picked up the text of the next instruction without completing CALCRIM No. 361. A copy of CALCRIM No. 361 was provided, however, in the instructional packet given to the jury for use during deliberations. In addition, the court told the jury that it would receive a copy of the written instructions for use in the jury room.

> We conclude any error in failing to read the instruction was harmless under either the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24, or the reasonably probable standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. (Cf. *People v. Murillo* (1996) 47 Cal.App.4th 1104, 1108 [failure to instruct on elements of offense is error of clear constitutional import, but failure to instruct jury on one of tests used in evaluating credibility of witness is evaluated under *Watson*].)

The jury here was given written instructions, which included the complete CALCRIM No. 361 instruction. (*People v. Prieto* (2003) 30 Cal.4th 226, 255.) The written instructions govern in any conflict between the oral and written instructions. (*People v. Osband* (1996) 13 Cal.4th 622, 717.) We may presume that the jury was guided by the written instructions. (*People v. McLain* (1988) 46 Cal.3d 97, 111, fn. 2; *People v. Davis* (1995) 10 Cal.4th 463, 542.) We recognize that in *People v. Murillo, supra*, 47 Cal.App.4th at pages 1107-1108, another appellate court refused to presume the jury read the written instructions in the absence of evidence that it had done so. *Murillo*, however, does not cite to either *McLain* or *Davis*, nor does it address the presumption announced and applied in both these state Supreme Court cases. In *Murillo*, the court made no reference to the missing instruction in the oral reading and therefore there was nothing to alert the jury that there was conflict between the oral and written instructions that needed resolving. Here, the trial court began to give CALCRIM No. 361 and then abruptly went on to another instruction. This would alert the jury that reference to the written instructions was needed.

In addition, when considering an allegation of instructional error, we look to the instructions as a whole. (*People v. Jablonski* (2006) 37 Cal.4th 774, 831; *People v. Reliford* (2003) 29 Cal.4th 1007, 1013.) In this case, the jury was told how to evaluate the testimony of any witness testifying (CALCRIM No. 226), and was told that neither side is required to call all witnesses or to produce all evidence relevant to the case (CALCRIM No. 300). The jury was told repeatedly that the prosecution bore the burden of proving beyond a reasonable doubt that Miller had committed the offense.

The jury was also told, with specific reference to Miller, that any evidence it heard from Miller or statements attributed to Miller had to be evaluated in light of all other evidence, and that it was up to the jury to decide the importance of this evidence. This instruction was in reference to prior statements by Miller, any false statements by Miller, any evidence that Miller tried to hide evidence, and any evidence that Miller left the scene of the crime. (CALCRIM Nos. 358, 362, 371, 372.) As to each of these, the jury was instructed that it was to determine whether this evidence was significant. In most instances, the jury was further instructed that the

36

1
2
3
4
5
6
7
8

> evidence that Miller had made a false statement or tried
> to hide evidence was not sufficient by itself to prove
> guilt. In light of these instructions, we conclude the
> jury understood it was to rely only on evidence actually
> before it and that it was not to place significance on any
> failure by Miller to explain evidence adverse to him when
> testifying. It also was clear to the jury that the
> prosecution retained the burden of proof no matter what
> evidence was or was not produced by Miller. (See *People v.
> Murillo, supra*, 47 Cal.App.4th at p. 1109 [when viewed as
> whole, court concludes jury was adequately instructed on
> relevant legal principles, despite absence of required
> instruction].)

9 People v. Miller, 2009 WL 5067612 at *7-*8.

10    Respondent argues that the CCA's reasoned decision on the issue

11 was a reasonable application of clearly established federal law and

12 did not involve an unreasonable finding of fact based on the

13 evidence before the state courts; the state court concluded that the

14 written form of the instruction was given to the jury, and that in

15 light of the totality of the instructions, the jury understood the

16 burdens of proof and the absence of any obligation of Petitioner to

17 explain evidence in his testimony.  (Ans., doc. 19, 28-30.)

18    B.  Legal Standards

19    The only basis for federal collateral relief for instructional

20 error is that the infirm instruction or the lack of instruction by

21 itself so infected the entire trial that the resulting conviction

22 violates due process.  Estelle v. McGuire, 502 U.S. at 71-72 (1991);

23 Cupp v. Naughten, 414 U.S. 141, 147 (1973); see Donnelly v.

24 DeChristoforo, 416 U.S. 637, 643 (1974) (it must be established not

25 merely that the instruction is undesirable, erroneous or even

26 "universally condemned," but that it violated some right guaranteed

27 to the defendant by the Fourteenth Amendment).  The instruction may

28 not be judged in artificial isolation, but must be considered in the

context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72.

In reviewing an ambiguous instruction, it must be determined whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72-73 (reaffirming the standard as stated in *Boyde v. California*, 494 U.S. 370, 380 (1990)). The Court in *Estelle* emphasized that the Court had narrowly defined the category of infractions that violate fundamental fairness, and that beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. *Id.* at 72-73.

Moreover, even if there is instructional error, a petitioner is generally not entitled to habeas relief for the error unless it is prejudicial. The harmless error analysis applies to instructional errors as long as the error at issue does not categorically vitiate all the jury's findings. *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (citing *Neder v. United States*, 527 U.S. 1, 11 (1999) (quoting *Sullivan v. Louisiana*, 508 U.S. 275 (1993) concerning erroneous reasonable doubt instructions as constituting structural error)).

In *Hedgpeth v. Pulido*, the Court cited its previous decisions that various forms of instructional error were trial errors subject to harmless error analysis, including errors of omitting or misstating an element of the offense or erroneously shifting the burden of proof as to an element. *Hedgpeth*, 555 U.S. 60-61. To determine whether a petitioner proceeding pursuant to § 2254 suffered prejudice from such an instructional error, a federal court must determine whether the petitioner suffered actual prejudice by assessing whether, in light of the record as a whole, the error had

38

a substantial and injurious effect or influence in determining the jury's verdict.  <u>Hedgpeth</u>, 555 U.S. at 62; <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993).

C.  <u>Analysis</u>

Petitioner contends the jury was not orally instructed with CALCRIM 361, which provided:

> If the defendant failed in his testimony to explain
> or deny evidence against him, and if he could
> reasonably be expected to have done so based on
> what he knew, you may consider his failure to explain
> or deny in evaluating that evidence.  Any such failure
> is not enough by itself to prove guilt.  The People
> must still prove each element of the crime beyond
> a reasonable doubt.
>
> If the defendant failed to explain or deny, it is up
> to you to decide the meaning and importance of that
> failure.

(2 CT 574.)  The record confirms that the written instruction was given to the jury.  (9 RT 1248-49, 1291.)  The jury was also orally instructed that the jury must judge the credibility or believability of the witnesses and neither side was required to call all witnesses or put on all relevant evidence.  The jury was also instructed on the need to consider various factors in considering and evaluating the defendant's statements, the need to view statements with caution unless recorded or written, the corpus delicti rule and the need for independent evidence, and the fact that guilt may not be proved by a defendant's false statement, hiding evidence, or flight alone. (2 CT 535-6, 547-48, 550, 557, 560-65.)  The jury was also given detailed instructions on the burden of proof.  (<u>Id.</u> at 533, 542, 546.)  The state court noted the totality of the instructions, reasonably concluded that the jury would refer to the written

instructions, and reasonably concluded that the jury understood that affirmative proof beyond a reasonable doubt was required for conviction and that any failure of Petitioner was to be evaluated in light of that burden.

On the record before this Court, it does not appear that the error had a substantial and injurious effect or influence in determining the jury's verdict.  The Court concludes that there was no fundamental unfairness created by the omission of the full oral version of the instruction.  Accordingly, it will be recommended that Petitioner's claim concerning the incomplete jury instruction be denied.

IX.   Cruel and Unusual Punishment

Petitioner alleges his sentence constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and it also violated the trial court's discretion.  (Pet., doc. 1, 5.) In the traverse, Petitioner contends that the sentence is in effect a sentence of life without the possibility of parole.  (Trav., doc. 30, 3.)

A.   The State Court Decision

The reasoned decision of the CCA, which was left undisturbed by the CSC (LD 6), is as follows:

III. Cruel and unusual punishment

Miller next contends that his sentence of 82 years to life equates to life without possibility of parole. Since he is a young man with no prior criminal record, Miller claims this sentence constitutes cruel and unusual punishment in violation of both the state and federal Constitutions.

"Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment

40

is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity." (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted.)

The Legislature has deemed it appropriate to impose harsh punishment for those who take a life and do so by personally discharging a firearm. Miller acknowledges that all components of his sentence are mandated by statute and that imposition of a section 12022.53 firearm enhancement has been uniformly upheld in California. (See *People v. Felix* (2003) 108 Cal.App.4th 994, 999–1002.) " 'Defining crime and determining punishment are matters uniquely legislative in nature, resting within the Legislature's sole discretion.' [Citation.]" (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251.) "Our Supreme Court has emphasized 'the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned "unless their unconstitutionality clearly, positively, and unmistakably appears." ' [Citation.]" (*People v. Kinsey* (1995) 40 Cal.App.4th 1621, 1630.)

A sentence that is the functional equivalent of life without possibility of parole is not, as a matter of law, unconstitutionally disproportionate. (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399 [term of 240 years], disapproved on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.) As a result, we must determine if such a sentence is cruel or unusual based on Miller's current offenses and criminal history, applying the familiar test of disproportionality adopted under both the federal and state Constitutions. (*People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1136 [court has authority to intervene and find sentence unconstitutional where there is proper showing, even when sentence authorized by statute]; *Solem v. Helm* (1983) 463 U.S. 277, 289–290.) We review independently the question of

41

whether Miller's sentence is cruel and unusual. (*People v. Mora* (1995) 39 Cal.App.4th 607, 615.)

Miller focuses his challenge on the nature-of-the-offense and the nature-of-offender analyses identified in *In re Lynch* (1972) 8 Cal.3d 410, 425. The factors identified in *Lynch* are: (1) the nature of the offense and/or the offender; (2) the nature of the punishment compared to other punishments imposed by the same jurisdiction for more serious offenses; and (3) the nature of the punishment compared to other punishments imposed by other jurisdictions for the same offense. (*Id.* at pp. 425-427.) Regarding the offense, the court must evaluate the totality of the circumstances surrounding the offense, including its motive, the way it was committed, the defendant's involvement, and the consequences of the offense. Regarding the offender, the court must evaluate the defendant's individual culpability, including his age, prior criminality, personal characteristics, and state of mind. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.) The federal Constitution affords no greater protection than the state Constitution. (*People v. Martinez, supra,* at p. 1510; *People v. Haller* (2009) 174 Cal.App.4th 1080, 1092.)

Miller focuses only on the first *Lynch* factor—his individual culpability. He claims he is a youthful offender, without a criminal history, attending college and playing football, and is someone who has a chance of being rehabilitated. Based on these facts, he claims the sentence imposed was disproportionate with the crime committed.

We disagree. Miller's crime was senseless and unprovoked. It did not involve the use of drugs or alcohol. Miller took the life of a young man and severely injured another young man. It unleashed violence at a place where individuals come to seek medical aid, placing medical personnel as well as innocent and medically compromised individuals at risk. Miller soberly chose to pick up a gun that had been abandoned on the street rather than call law enforcement; to drive to his cousin's house to find appropriate ammunition despite the immediate medical needs of his cousin; and to deliberately shoot an unarmed individual at close range without provocation.FN3 He then fired at a fleeing Davalos, despite the crowd of individuals present and at risk. Miller knew Adell was

42

the aggressor in the conflict between Adell and Rios. He knew or should have known that the individuals present at the hospital were not the individuals responsible for the shootings at the party. He chose to respond with violence without regard to the consequences of his actions on the lives of others.

> FN3. Miller argues in his opening brief that he shot Rios only after believing that both Rios and Davalos were reaching for weapons in their waistbands. He claims this court must accept this fact as true, citing *People v. Toledo* (1948) 85 Cal.App.2d 577. We disagree. First, Miller did not claim self-defense at trial. The jury heard that this was what Miller claimed when first interviewed by police, but the defense was not raised or argued at trial. The jury obviously rejected as true Miller's earlier initial claim that he acted in self-defense, otherwise the jury could not have found the murder to be of the first degree. We need only accept as true those facts and inferences that could have been deduced from the evidence to support the verdict. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237; *People v. Reilly* (1970) 3 Cal.3d 421, 425.) Second, the *Toledo* doctrine is not applicable where there is other competent and substantial evidence to establish guilt as there is in this case. (See *Matthews v. Superior Court* (1988) 201 Cal.App.3d 385, 393-394 [where defendant's statement tends to disprove criminality but other prosecution evidence tends to prove criminality, it is function of jury to determine which version is correct].)

We conclude the sentence imposed is not constitutionally disproportionate to the crime committed under either the state or federal Constitution.

People v. Miller, 2009 WL 5067612 at *8-*10.

### B.   Analysis

A criminal sentence that is "grossly disproportionate" to the crime for which a defendant is convicted may violate the Eighth Amendment.  Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Harmelin v.

Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring);

Rummel v. Estelle, 445 U.S. 263, 271 (1980).  Outside of the capital

punishment context, the Eighth Amendment prohibits only sentences

that are extreme and grossly disproportionate to the crime.  United

States v. Bland, 961 F.2d 123, 129 (9th Cir. 1992) (quoting Harmelin

v. Michigan, 501 U.S. 957, 1001, (1991) (Kennedy, J., concurring)).

Such instances are "exceedingly rare" and occur in only "extreme"

cases.  Lockyer v. Andrade, 538 U.S. at 72 73; Rummel, 445 U.S. at

272.  So long as a sentence does not exceed statutory maximums, it

will not be considered cruel and unusual punishment under the Eighth

Amendment.  See United States v. Mejia Mesa, 153 F.3d 925, 930 (9th

Cir. 1998); United States v. McDougherty, 920 F.2d 569, 576 (9th

Cir. 1990).

Here, even if the issue is considered de novo, in light of the

limited range of disproportionate sentences recognized as Eighth

Amendment violations under Supreme Court authority, and considering

the nature of Petitioner's criminal conduct and the danger to

society it presented, Petitioner's sentence was not disproportionate

and did not offend the Eighth and Fourteenth Amendments.  Cf.

Plasencia v. Alameida, 467 F.3d 1190, 1204 (9th Cir. 2006) (holding

that a sentence of fifty years to life for murder with use of a

firearm is not grossly disproportionate); People of Territory of

Guam v. Sablan, 584 F.2d 340, 341 (9th Cir. 1978) (upholding a life

sentence for first degree felony murder); United States v. LaFleur,

971 F.2d 200, 211 (9th Cir. 1991) (upholding life imprisonment for

first degree murder); Harris v. Wright, 93 F.3d 581, 585 (9th Cir.

1996) (upholding a mandatory sentence of life without parole for
first degree murder committed by a young offender).  Accordingly, it
will be recommended that Petitioner's claim of cruel and unusual
punishment be denied.

X.   Ineffective Assistance of Trial Counsel

Petitioner alleges he suffered the ineffective assistance of
counsel (IAC) in violation of his constitutional rights based on
trial counsel's failure to investigate Petitioner's PTSD as an
exculpatory and mitigating defense.  (Pet., doc. 1, 5.)  Petitioner
contends counsel should have addressed the trial court's failure to
put the burden of proof of an unspecified essential element of
murder on the prosecution.  (Doc. 30, 3.)

Respondent relies on the TCSC's decision on habeas review, and
the CSC's denial of review based on Petitioner's failure to provide
any facts in support of his claim.  (Ans., doc. 19, 30-34.)  The
California Supreme Court cited Duvall and Swain, which Respondent
argues amounts to a determination on the merits that the state court
presentation was unworthy of relief, as well as a ruling that the
claims were not presented fairly, citing Cross v. Sisto, 676 F.3d
1172, 1177 (2012).  Alternatively, Respondent argues that if the
defect is incurable, the California Supreme Court's ruling means
that court has found the "claims themselves are defective."  Kim v.
Villalobos, 799 F.2d 1317, 1320 (9th Cir. 1986).

In a habeas case, the issue of procedural bar need not be
resolved if another issue is capable of being resolved against the
petitioner.  Lambrix v. Singletary, 520 U.S. 518, 525 (1997).
Likewise, the procedural default issue, which may necessitate
determinations concerning cause and miscarriage of justice, may be

45

more complex than the underlying issues in the case.  In such circumstances, it may make more sense to proceed to the merits.  See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  The Court thus proceeds to the merits of Petitioner's claim.

> A.  Background

The decision of the TCSC is as follows:

> Regarding the ineffective assistance of counsel claim, the petitioner has failed to establish the basic requirements for success on that claim. The leading cases are (*Strickland v. Washington* 466 U.S. 668, 104 S.Ct. 2053 and *In Re Hardy* (2007) 41 Cal4th 977, 1018).  The *Strickland* court stated "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." (*id* at p 687.)
>
> The California Supreme Court in *In Re Alfredo Reyes Valdez* at 2010 DJDAR 10603 stated "To make the required showings, petitioner must show that his attorney's representation fell below an objective standard of reasonableness under prevailing professional norms" (*Strickland supra* and *Hardy supra*). Establishing a claim of ineffective assistance of counsel requires the defendant to demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance prejudiced the defendant, i.e. there is a

1
2
3
4
5
6

"reasonable probability" that, but for counsel's
unprofessional errors, the result of the proceeding would
have been different. A reasonable probability is a
probability sufficient to undermine confidence in the
outcome. This second part of the Strickland test "is
solely one of outcome determination. Instead, the question
is "whether counsel's deficient performance renders the
result of the trial unreliable or the proceeding
fundamentally unfair."

7

[¶] . . . [¶]

8
9
10

A defendant is entitled to a new trial if he received
ineffective assistance of counsel at trial. (*People v.
Lagunas* (1994) 8 Cal.4th 1030, 1036.) No such showing has
been raised in the instant writ.

11
12
13
14
15

The court in *People v. Dennis* (1998) 17 Cal.4th 468, 540-
541 stated: "Our review is deferential; we make every
effort to avoid the distorting effects of hindsight and to
evaluate counsel's conduct from counsel's perspective at
the time. A court must indulge a strong presumption that
counsel's acts were within the wide range of reasonable
professional assistance.["]

16
17

Petitioner failed to raise any issues which rise to the
level of prima facie evidence which would warrant relief.

18

(LD 8.)

19

     B.  <u>Analysis</u>

20

The law governing claims concerning ineffective assistance of

21

counsel is clearly established for the purposes of the AEDPA

22

deference standard set forth in 28 U.S.C. § 2254(d).  <u>Premo v.</u>

23

<u>Moore</u>, -U.S. -, 131 S.Ct. 733, 737-38, 178 L.Ed.2d 649 (2011);

24

<u>Canales v. Roe</u>, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

25

To demonstrate ineffective assistance of counsel in violation

26

of the Sixth and Fourteenth Amendments, a convicted defendant must

27

show that 1) counsel's representation fell below an objective

28

standard of reasonableness under prevailing professional norms in

light of all the circumstances of the particular case; and 2) unless

prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  A petitioner must identify the acts or omissions of counsel alleged to have been deficient. Strickland, 466 U.S. 690.  This standard is the same standard that is applied on direct appeal and in a motion for a new trial.  Strickland, 466 U.S. 697-98.

In determining whether counsel's conduct was deficient, a court should consider the overall performance of counsel from the perspective of counsel at the time of the representation. Strickland, 466 U.S. at 689.  There is a strong presumption that counsel's conduct was adequate and within the exercise of reasonable professional judgment and the wide range of reasonable professional assistance.  Strickland, 466 U.S. at 688-90.

In determining prejudice, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding.  Strickland, 466 U.S. at 694. In the context of a trial, the question is thus whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt.  Strickland, 466 U.S. at 695.  This Court must consider the totality of the evidence before the fact finder and determine whether the substandard representation rendered the proceeding fundamentally unfair or the results thereof unreliable. Strickland, 466 U.S. at 687, 696.

A court need not address the deficiency and prejudice inquiries in any given order and need not address both components if the

petitioner makes an insufficient showing on one.  <u>Strickland</u>, 466 U.S. at 697.

Further, when a state court has adjudicated a petitioner's IAC claim, the standard of review is doubly deferential; the Court has cautioned that "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."  <u>Premo v. Moore</u>, 131 S.Ct. at 739-40 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. 770 (2011)).

Here, Petitioner contends counsel's failure to challenge the admission of Petitioner's statements based on PTSD is the omission that was not the result of reasonable professional judgment.  <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. at 490.  Logically this claim may relate to the issues of the presence of a valid waiver of Petitioner's <u>Miranda</u> rights, the voluntariness of Petitioner's admissions to law enforcement, and even Petitioner's criminal culpability.  However, Petitioner does not state any facts in support of his claim.

Neither party has directed the Court to any portion of the record that would reflect the nature, extent, or frequency of any PTSD symptoms, any diagnosis or treatment for PTSD, how any PTSD affected any event or proceeding relevant to this case, or how counsel might have been obligated to undertake any specific conduct. The claim is unsupported by an allegation of specific facts or by evidence; mere speculation is insufficient to demonstrate deficient performance or prejudice.  <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1088-89 (9th Cir. 2001); <u>Dows v. Wood</u>, 211 F.3d 480, 486 (9th Cir. 2000).

1      Further, no possible prejudice appears.  Even if assuming

2  Petitioner suffered PTSD, the mental illness of a person making an

3  admission or confession does not render the statement involuntary

4  absent coercive conduct by law enforcement.  Colorado v. Connelly,

5  479 U.S. 157, 167 (1986).  Here, there was no coercive conduct on

6  the part of law enforcement.

7      In summary, the state court's decision was a reasonable

8  application of clearly established federal law that was supported by

9  the record.  Even if the claim is reviewed de novo, no ineffective

10  assistance of trial counsel has been established.  Accordingly, it

11  will be recommended that Petitioner's claim concerning the

12  ineffective assistance of trial counsel be denied.

13      XI.   Ineffective Assistance of Appellate Counsel

14      Petitioner alleges he suffered the ineffective assistance of

15  appellate counsel in violation of his constitutional rights based on

16  counsel's failure to raise issues that were matters of record,

17  including 1) failure properly to Mirandize Petitioner, 2) unlawful

18  interrogation; 3) psychological coercion; 4) improper waiver of

19  Miranda rights; and 5) failure to suppress evidence resulting from a

20  warrantless entry of a structure made without exigent circumstances

21  or consent and a warrantless arrest made pursuant to the entry.

22  (Pet., doc. 1, 5.)

23      As the previous analysis of Petitioner's challenges based on

24  Miranda and the due process protection against admission of

25  involuntary statements demonstrates, the record does not show

26  counsel was deficient for failing to challenge the admission of the

27  statement on those grounds.  The failure to make a motion which

28  would not have been successful or was otherwise futile does not

50

constitute ineffective assistance of counsel.  <u>James v. Borg</u>, 24
F.3d 20, 27 (9th Cir. 1994).

With respect to a Fourth Amendment challenge to the statement
as the fruit of an allegedly unlawful entry and arrest, it is
unclear what standing the Petitioner would have to challenge the
warrantless entry of a third party's residence.  This is
particularly true where the record supports the express finding of
the trial court that the owner of the structure consented to entry
and search.  As a person on the premises with the permission of the
owner, Petitioner could not challenge an invasion of the owner's
privacy interest, let alone override the owner's consent.  <u>See</u> <u>Rakas</u>
<u>v. Illinois</u>, 439 U.S. 128, 133-34 (1978) (Fourth Amendment rights
may not be vicariously asserted).  To the extent Petitioner
otherwise lodges a Fourth Amendment challenge to the arrest and its
fruits, Petitioner has not shown that the government lacked probable
cause for Petitioner's arrest in a public place or that the arrest
was unlawful.

The Court concludes that Petitioner has not established that
his appellate counsel was deficient in not raising Petitioner's
issues or that any omission resulted in prejudice to Petitioner.
Accordingly, it will be recommended that Petitioner's claim that he
suffered the ineffective assistance of appellate counsel be denied.

XII.  <u>Certificate of Appealability</u>

Unless a circuit justice or judge issues a certificate of
appealability, an appeal may not be taken to the Court of Appeals
from the final order in a habeas proceeding in which the detention
complained of arises out of process issued by a state court.  28
U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336

(2003). A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Habeas Rule 11(a).

A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right. § 2253(c)(2). Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether: (1) the petition states a valid claim of the denial of a constitutional right, and (2) the district court was correct in any procedural ruling. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong. Id. An applicant must show more than an absence of frivolity or the existence of mere good faith; however, the applicant need not show that the appeal will succeed. Miller-El v. Cockrell, 537 U.S. at 338.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner. Petitioner has not made a substantial showing of the denial of a constitutional right. Accordingly, it will be recommended that the Court decline to issue a certificate of appealability.

///

52

XIII.   <u>Recommendations</u>

Based on the foregoing, it is RECOMMENDED that:

1)   The petition for writ of habeas corpus be DENIED;

2)   Judgment be ENTERED for Respondent; and

3)   The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 27, 2015**                    **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE